00-1406.so

No. 2--02--0090

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Du Page County

)

Plaintiff-Appellee, )

) 

v. ) No. 00--CF--259

)

RODNEY FIELDS, ) Honorable

) Kathryn E. Creswell,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE O’MALLEY delivered the opinion of the court:

Defendant, Rodney Fields, appeals from his conviction of two counts of money laundering (720 ILCS 5/29B--1 (West 2000)), following a bench trial before the circuit court of Du Page County.  Defendant contends that the trial court made prejudicially erroneous evidentiary rulings during the trial, that the indictment insufficiently apprised him of the illegal conduct with which he was charged, and that the evidence presented by the State was insufficient to prove him guilty beyond a reasonable doubt of the charged offenses.  We agree that the indictment was fatally deficient, and we reverse.

This matter arose from defendant’s purchase of two cars from Laurel Motors in Westmont.  Defendant was indicted for money laundering and, on November 13, 2000, he moved to dismiss the indictment, arguing that the two counts were pleaded generally and without specificity.  The trial court denied defendant’s motion but ordered the State to provide a bill of particulars specifying the nature of the criminally derived property and its source.  On November 28, 2000, the State filed its bill of particulars, stating that count I alleged money laundering in connection with the sale and financing of a 1999 Mercedes automobile and that count II alleged money laundering in connection with the sale and financing of a 2000 Mercedes automobile.  The State noted that the nature of the criminally derived property was defined by statute and outlined in the discovery tendered to defendant.  The State concluded that it was not aware of the source of any criminally derived funds.

Defendant again moved to dismiss the indictment, arguing that the statute so broadly defined criminally derived property that he could not prepare a defense.  Defendant also argued that the indictment was still so unspecific as to be defective.  The State replied that it had complied with all applicable discovery rules.  The trial court denied defendant’s second motion to dismiss.  Thereafter, the matter proceeded to a bench trial.

At trial, the evidence showed that, in January 1999, defendant entered Laurel Motors in Westmont, Illinois, to purchase a Mercedes S430 automobile.  At that time, defendant had not filed a tax return since 1996.  The model defendant was seeking was back ordered, so defendant would have had to wait about six months to obtain it.  Instead, Laurel Motors salesman Joe Smalzer offered defendant a less expensive model, a CLK 430.  On about March 20, 1999, defendant agreed to purchase the CLK 430 and filled out an application for credit with the Mercedes Credit Corporation in his own name.  Defendant was accompanied by Edwin Jones.  Jones also filled out an application for the financing necessary to purchase the CLK 430.  Some of the documents were signed by defendant and some were signed by Jones.  Smalzer could not remember how he obtained all of the documents and was unaware of who signed what documents.  Smalzer was also unaware to whom the car was delivered, but he testified that he saw defendant drive it into the dealership for servicing.

As part of the information collected by Laurel Motors for the financing, defendant provided a W-2 form listing Jones as an employee of Supreme Life Entertainment.  The W-2 form provided by defendant showed that Jones was earning an annual salary of $98,000.  Jones testified that he had never been employed by Supreme Life Entertainment.  The State introduced records from the Department of Revenue showing that Supreme Life Entertainment never paid taxes.  Detective William Murphy visited the two addresses provided on the W-2 form for Supreme Life Entertainment.  At those addresses, he found a vacant store front and a boarded-up home.  Detective Murphy did not investigate further to determine the leasing history, if any, of the two properties.

Jones testified that, in the purchase of the CLK 430, defendant provided all of the money for the down payment.  Jones did nothing but fill out some paperwork and sign documents when told to sign.

In June 1999, the car defendant had originally wished to purchase, a Mercedes S430, became available, and Laurel Motors contacted defendant.  Defendant indicated that he wanted to get the car, but would again have Jones assist him with the paperwork.  Mercedes Credit initially rejected financing for the second purchase, as it was so close in time to the first purchase.  Smalzer explained to Mercedes Credit that defendant originally wanted the S430, which was unavailable in March, and Mercedes Credit approved the financing.  The information that had been submitted for the financing on the CLK 430 was copied and submitted again.  The total down payment of $9,500 for the S430 again was provided entirely by defendant even though it was logged as having been received from Jones.  Defendant conducted and completed the negotiations for the purchase of the S430 before the appearance of Jones, who once again signed documents when told to do so.

Jones testified under a grant of use immunity.  He testified that, in March 1999, he accompanied defendant to Laurel Motors to cosign for a loan on a car.  Once there, he learned that, even with a cosigner, defendant would be unable to purchase the car due to defendant’s poor credit.  To avoid either a very large down payment or an unfavorably high interest rate, Jones testified that he signed as the purchaser, even though defendant did not ask him to act as the purchaser.  He further testified that he filled out the credit application at the dealership, listing his employer as Supreme Life Entertainment and his annual salary as $98,000, because he did not want anyone calling his actual employer.  Jones denied that defendant asked him to list Supreme Life Entertainment as his employer.  Jones testified that a W-2 for his purported employment at Supreme Life Entertainment was produced but that he did not know where the W-2 came from.  

Jones admitted that he had never worked for Supreme Life Entertainment.  He did not know where the down payment on the first car came from but witnessed defendant make the down payment on the second car.  Jones testified that he did not make any of the monthly payments on the cars and did not know how they were made.

Jones testified that both he and defendant drove the first car.  With respect to the second car, Jones testified that defendant picked it up when it was ready and was the primary driver.  Jones testified that the second car was put in his name due to defendant’s poor credit.

A number of Jones’s statements were impeached by a written statement Jones had provided to police.  The statement was redacted and admitted as substantive evidence pursuant to section 115--10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--10.1 (West 2000)).  The court admitted the following four portions of Jones’s written statement given to the Wheaton police:

1. "In April 1999 [defendant] ask [
sic
] if I could co-

sign for a 1999 CLK 430 Mercedes Benz. [Defendant] changed his

[
sic
] and then ask [
sic
] if I could finance the vehicle for

him."

2. "[Defendant] provided Schmalzer [
sic
] with the W-2

form for Supreme Life Entertainment. [Defendant] had me employed as vice president earning $98,000 yearly."

3. "[Defendant] ask [
sic
] me to put this vehicle in my

name because he did not have a legitimate source of income."

4. "[Defendant] told [
sic
] did not want this vehicle in

his name because he has no legitimate source of income."

Katrina Mack next testified, also under a grant of use immunity.  She testified that she was defendant’s girlfriend.  She testified that, in December 1999, she had helped defendant purchase a Cadillac Escalade.  Mack testified that she negotiated the purchase of the vehicle.  She was impeached, however, by her written statement to police in which she stated that she had signed for the Escalade after defendant had negotiated the deal.  Mack then testified that the police told her what to say.

Continuing, Mack testified that she made both the down payment and the first payment for the Escalade from her own funds, after which the car was repossessed.  Mack was again impeached by her written statement, which related that defendant made both the down payment and the first monthly payment.  Mack again stated that the Wheaton police had told her what to say.

When asked how defendant made his money, Mack testified that she did not know.  She was shown her written statement in which she stated, "[A]ll of [defendant’s] money comes from dealing drugs."  Defendant’s objection to that statement as a conclusion was overruled.

At that point, the State moved to admit the entirety of Mack’s written statement as substantive evidence pursuant to section 115--10.1 of the Code.  After hearing argument, the trial court took the matter under advisement and concluded the proceedings for the day.  When the proceedings resumed the next day, the trial court admitted the written statement in its entirety as substantive evidence.  The trial court noted that portions of the written statement also constituted admissions by defendant and rejected defendant’s argument that they instead constituted double hearsay.

Mack’s written statement related:

"Dec. 19, 1999[,] I purchase [
sic
] a Cadillac Escalade from Foley-Rice in Oak Park [sic] the vehicle was put in my name for [defendant].  I know [defendant] to be a drug dealer and the vehicle was put in my name because [defendant] has no job and no way to show payments of the vehicle other than drug money. [Defendant] made the down payment of [$]3,000 and makes the insurance pymts. of [$]184.00.  The bill is sent to my house and [defendant] picks them up and gets a money order for $683.509 and $184.00.  I’ve been dating [defendant] for 8 months and he hasn’t had a job since.  All of [defendant’s] money comes from dealing drugs.  We had numerous conversation [
sic
] of where his money come [
sic
] from and have hear he [
sic
] on his cell phone speaking of this.  I know of about 4 people that sell drugs for him. [Defendant] spends about [$]20-40 thousands on drugs a month.  I signed for the truck after [defendant] negotiated the deal with Joe Ott.  I was trying to do a favor for [defendant].  I have no claim to the truck."

When Mack was cross-examined, she testified that she had never seen defendant deal drugs or sell drugs.  She also denied that she heard defendant talk about selling drugs.

The State called Officer Murphy, who testified about the circumstances of the taking of Mack’s written statement.  He denied that he had told Mack what to say.

Detective William Cooley of the Wheaton police department testified next.  He testified that, on February 10, 2000, he tried to arrest defendant.  He first observed defendant driving a black Cadillac Escalade in Maywood.  Detective Cooley was driving a semi-unmarked black Crown Victoria at that time.  Defendant entered the I-290 expressway and proceeded eastbound while Detective Cooley followed him.  Detective Cooley testified that defendant remained in the right-hand lane until he eventually exited and stopped his car in front of the 15th District Chicago police station, at which time defendant was taken into custody.

Defendant was then transported to the Wheaton police department and questioned.  Defendant was given 
Miranda
 warnings and agreed to give a verbal statement but refused to put anything in writing, including a signed 
Miranda
 waiver.  Detective Cooley testified that defendant admitted that he used to sell cocaine with Derrick Jones, Edwin Jones’s brother.  According to Detective Cooley, defendant stated that he had gone to Laurel Motors to purchase a car, and that he negotiated the deal and then asked Jones to come in to sign the papers.  He used Jones because Jones had a job.

With regard to the second vehicle, the S430, defendant again used Jones to help him.  Defendant admitted making all of the payments on the cars.  Detective Cooley testified that defendant stated that, when he received a telephone call from Joe Smalzer at Laurel Motors advising him that the police had been there asking about his vehicle, defendant dumped his cell phone in order to frustrate the ability of the police to track him.  Detective Cooley testified that, with regard to the Escalade, defendant told him that Mack had purchased the vehicle for him.

Defendant told police that he was a record producer and had made $8,000 with Supreme Life Entertainment.  He admitted that he was a small-time drug dealer and had sold about a quarter-kilogram of cocaine during the period of January to April 1999.  Defendant became belligerent over his arrest, telling the detectives that arresting him in public could get him killed because people would know that "he’s hot."  Detective Cooley also testified that defendant told him that he had purchased a kilogram of cocaine on several other occasions and that sometimes the cocaine was fronted to him, meaning that he did not have to pay for it in advance.  Detective Cooley testified that defendant did not give him any specific detail on these other purchases.

On cross-examination, Detective Cooley testified that, when defendant stopped in front of the 15th District Chicago police station, he was ordered out of the car at gunpoint.  Defendant told police that he had driven to the Chicago police station because he did not know that it was the police who were following him and he thought that they were people who were going to kill him.  Detective Cooley explained that his vehicle had no exterior police markings.  Detective Cooley testified that defendant’s car was searched and no contraband was discovered.  He testified that the interview with defendant lasted three hours.  Defendant denied that he had any ownership rights to the Escalade and denied making any payments for it.

The State offered into evidence records regarding the purchase of a Ford Expedition and the Escalade.  The State also offered into evidence redacted portions of Jones’s written statement and Mack’s written statement.  Following the admission of these documents, the State rested.  The trial court denied defendant’s motion for a directed finding.

Defendant did not testify.  Defendant offered into evidence the articles of the limited liability company, Supreme Life Entertainment.  Defendant then rested.

The trial court found defendant guilty of both counts.  The trial court noted that this case differed from most money laundering investigations because they usually arise out of other criminal offenses, but in this case, there was no specific underlying criminal activity to form the basis of any particular charges.  The trial court relied on Mack’s written statement in finding that defendant had no job and that his income was derived from selling drugs.  The trial court also found it significant that Supreme Life Entertainment had not been incorporated or filed any tax returns.  Defendant’s posttrial motion for a new trial was denied, and defendant was sentenced to a three-year term of imprisonment.  Defendant timely appeals.

On appeal, defendant contends that Mack’s written statement and the portions of Jones’s written statement were erroneously admitted as substantive evidence.  Defendant also argues that the indictment failed to sufficiently specify the nature and elements of the offense and was, therefore, fatally deficient.  Last, defendant argues that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt.

Because we find the indictment issue to be dispositive, we consider it first.  Defendant argues that the indictment was insufficient and too vague to allow him to prepare a defense in this matter.  The State indicted defendant on two counts of money laundering.  The first count alleged, in pertinent part:

"[O]n or about the 16th day of April, 1999, at and within DuPage County, Illinois, [defendant] committed the offense of Money Laundering in that said defendant knowingly engaged in a financial transaction in criminally derived property with a value exceeding $10,000.00 and knew that the financial transaction was designed in whole or in part to conceal the source of the criminally derived property in violation of 720 ILCS 5/29B--1 [(West 2000)]."

The second count of the indictment alleged, in pertinent part:

"[O]n or about the 16th day of August, 1999, at and within DuPage County, Illinois, [defendant] committed the offense of Money Laundering in that said defendant knowingly engaged in a financial transaction in criminally derived property with a value exceeding $10,000.00 and knew that the financial transaction was designed in whole or in part to conceal the source of the criminally derived property in violation of 720 ILCS 5/29B--1 [(West 2000)]."

Defendant filed two motions to dismiss the indictment in the trial court, both of which were denied.  On appeal, defendant argues that the indictment lacked the necessary detail to allow him to adequately prepare for trial.  We agree.

When a defendant challenges an indictment before trial, the court must review it to determine whether the indictment complied with section 111--3 of the Code (725 ILCS 5/111--3 (West 2000)).  
People v. Komes
, 319 Ill. App. 3d 830, 833 (2001).  Section 111--3(a) requires the charge to state, in writing, the name of the offense, to cite the statutory provision alleged to have been violated, and to state the name of the accused, the date of the offense, the county in which the offense occurred, and the nature and elements of the offense.  725 ILCS 5/111--3(a) (West 2000); 
Komes
, 319 Ill. App. 3d at 833.

Here, the indictment named the offense and the statutory section that was violated.  It included the dates of the occurrences and the county in which the offenses occurred, and it named the defendant.  Last, it recited the elements of the offense by mirroring the statutory language.

Defendant argues that the recitation of the terms of the statute was insufficient because the statute defines the offense  in only general terms.  In support, defendant cites 
People v. Gerdes
, 173 Ill. App. 3d 1024 (1988), 
People v. Yarbrough
, 162 Ill. App. 3d 748 (1987), and 
People v. Lyda
, 27 Ill. App. 3d 906 (1975).  Defendant argues that, when a statute encompasses a wide variety of conduct, the indictment must define the nature and elements of the offense in terms that are more specific than the broad and general language of the statute.  We agree.

In 
Gerdes
, the defendant was charged with obstructing justice by furnishing false information.  The court held that a charge of obstructing justice required more specificity than merely the statutory language.  
Gerdes
, 173 Ill. App. 3d at 1029-30.  The indictment referred to two statements given by the defendant but did not indicate which was the basis of the obstructing justice charge.  The court held that the indictment lacked the specificity and particularity required to adequately inform the defendant of the charges against him.  
Gerdes
, 173 Ill. App. 3d at 1030.  

In 
Yarbrough
, the indictment for communication with a juror was held to be insufficient where the content of the communication was not included.  
Yarbrough
, 162 Ill. App. 3d at 750-51.  In 
Lyda
, the indictment for obstruction of justice by destroying physical evidence was insufficient where it did not describe the physical evidence.  
Lyda
, 27 Ill. App. 3d at 912.  We find these cases to be sufficiently similar to the instant case as to support defendant’s argument that the indictment should have included more specificity regarding the elements of the offense.

The money laundering statute describes the prohibited conduct in only the most general terms.  A person commits the offense of money laundering:

"when he knowingly engages or attempts to engage in a financial transaction in criminally derived property with either the intent to promote the carrying on of the unlawful activity from which the criminally derived property was obtained or where he knows or reasonably should know that the financial transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the criminally derived property."  720 ILCS 5/29B--1(a) (West 2000).  

For example, the term "criminally derived property" is defined as "any property constituting or derived from proceeds obtained, directly or indirectly, pursuant to a violation of the Criminal Code of 1961, the Illinois Controlled Substances Act or the Cannabis Control Act."  720 ILCS 5/29B--1(b)(4) (West 2000).  Thus, anything obtained from a violation of the criminal and drug statutes can constitute the criminally derived property at issue in the indictment for money laundering.  The State’s failure to specify the "criminally derived property" at issue left defendant guessing as to whether he allegedly obtained the "criminally derived property" in violation of the drug statutes, a theft, or some other action that violated the criminal statutes.  

Similarly, "financial transaction" is defined as:

"a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition utilizing criminally derived property, and with respect to financial institutions, includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit or other monetary instrument or any other payment, transfer or delivery by, through, or to a financial institution."  720 ILCS 5/29B--1(b)(1) (West 2000).

In this case, the indictment did not indicate whether defendant’s "financial transaction" was the securing of a loan to pay for the cars, the payment of the down payment, the payment of the monthly installments, or a combination of any or all of those activities.  As a result, defendant here, like the defendant in 
Gerdes
 who was faced with two possible bases for the offense of obstructing justice, was left to guess at which action was serving as the basis for money laundering charges against him.  Thus, the two key elements of the offense, the "criminally derived property" and the "financial transaction," were defined in broad and conclusory language and did not apprise defendant of the prohibited conduct at issue in this case.

We note that the State’s response to defendant’s arguments fails completely to consider 
Gerdes
, 
Lyda
, or 
Yarbrough
.  Each of those cases held that broad statutory language requires the indictment to be pleaded with more particularity than is present in the statutory language.  Because the State entirely fails to grapple with this issue, we find its response inadequate.  Instead of dealing with the meritorious issue defendant raises, the State sidesteps the issue and claims that where the indictment complies with section 111--3 of the Code, then a defendant can prevail only by showing he was deprived of due process.  In light of the specificity and particularity requirements imposed by 
Gerdes
, 
Lyda
, and 
Yarbrough
, we must disagree with the State.  We also note that, in any event, because the State here failed to describe sufficiently the necessary elements and nature of the offenses alleged, the indictments do not comply with section 111--3 of the Code.

In addition, the State seems to suggest that the bill of particulars it provided should have cured any defects in the indictment.  Where an indictment fails to allege adequately the nature and elements of the offense, that is a fundamental defect that renders the indictment void and it cannot be amended as in the case of a simple formal defect.  
People v. Alvarado
, 301 Ill. App. 3d 1017, 1023 (1998).  We note that, while a bill of particulars may supplement a sufficient charge and thereby assist a defendant in preparing his defense, a bill of particulars cannot be used to cure a void charge.  
People v. Aud
, 52 Ill. 2d 368, 370 (1972); 
People v. Scott
, 285 Ill. App. 3d 95, 99 (1996); 
Yarbrough
, 162 Ill. App. 3d at 751.  Here, the State failed to charge adequately the nature and elements of money laundering where the charge only mirrored the statutory language.  This was a fundamental defect in the indictment and rendered it void.  The bill of particulars did not cure the defects in the indictment.

As a final comment, we note that the State, in arguing that defendant could not show a due process violation, cites a number of cases in which the underlying criminal activity, such as drug trafficking, was proved at trial.  For example, the State quotes at length 
United States v. Webster
, 960 F.2d 1301, 1308 (5th Cir. 1992), for the proposition that it need not prove precisely the source of the criminally derived property.  While 
Webster
 may stand for the proposition that evidence of a significant differential between legitimate income and cash outflow may support a conviction of money laundering, the government also presented evidence at trial of actual drug sales. Thus the source of all of the criminally derived property in 
Webster
 may not have been fully identified, the government nevertheless concretely attributed some of the money as coming from drug transactions.  
Webster
, therefore, was a significantly stronger case than this one, where the State did not present any evidence of specific drug transactions on defendant’s part.

As we have decided that the indictment was fatally defective, we need not address defendant’s other contentions.  For the foregoing reasons, therefore, the judgment of the circuit court of Du Page County is reversed.

Reversed.

CALLUM and GILLERAN JOHNSON, JJ., concur.